UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CR-20517-GRAHAM/MCALILEY

UNITED STATES OF AMERICA,

    Plaintiff,

v.

WILKENS MARDIGRAS,

    Defendant.
_____/

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS**

Defendant, Wilkens Mardigras, filed a Motion to Suppress Physical Evidence and Statements (ECF No. 16) (the "Motion"), to which the government filed a response in opposition (ECF No. 25). The Honorable Donald L. Graham referred the Motion to me for a report and recommendation. (ECF No. 17). On January 7, 2022, I held an evidentiary hearing at which four witnesses testified; three officers of the Miami Beach Police Department – Anthony Yarusso, Traci Sierra, and Daniel Melendez – and one Special Agent of the U.S. Secret Service, Lisbeth Carley. For the following reasons, I recommend that the Court deny the Motion.

    **I.   Background**

Defendant Wilkens Mardigras ("Defendant") has been charged by Indictment with having committed two crimes on February 25, 2021: possession of fifteen or more counterfeit and unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), and

1

aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1). (ECF No. 3). On February 25, 2021, law enforcement stopped, arrested, searched, and questioned Defendant, and it now intends to use evidence it gathered that night in its prosecution of Defendant. In his Motion, Defendant argues that law enforcement gathered that evidence in violation of Defendant's Fourth and Fifth Amendment rights, and that as a result, this Court should preclude the government from using it at trial.

## II.   The Evidentiary Hearing

### A.   Officer Yarusso

Officer Yarusso ("Yarusso") was the officer who first saw Defendant the evening of February 24 to 25, 2021[1], and stopped and arrested him. Yarusso has been employed at the Miami Beach Police Department ("MBPD") for four years, and for three years before that he was an officer with another police department. That night, Yarusso was assigned to a strategic enforcement team in the Miami Beach art deco cultural district. That team was tasked with proactively addressing the increase in crime associated with the Spring Break holiday, which was ongoing at that time. Yarusso and the team were working on Ocean Drive, which was closed to vehicle traffic and was filled at the time with pedestrians. There was a lot of cannabis odor in the area. Yarusso testified that during Spring Break there was a high incidence of violent crimes and narcotics-related activity in the area, especially cannabis use.

---

[1] For simplicity, the Court will use the date of February 25, 2021 to refer to the date of Defendant's arrest.

Yarusso knew that, by ordinance, the City of Miami Beach had made it unlawful to smoke cannabis, marijuana, or hemp products[2] on public property. He had received training about these substances; including how they look, smell and are used. Yarusso had also participated in hundreds of cannabis investigations, which he described as a "daily occurrence" at work.

Yarusso was operating a "Mule" at the time he encountered Defendant. It is a small vehicle with room for one passenger, that has a plexiglass front windshield, and is open on the sides and back. Officer Sierra was the passenger in the Mule. They were part of a convoy of Mules that MBPD officers used to enter a crowd of people on Ocean Drive. At about midnight, as he slowly drove south on Ocean Drive, Yarusso saw Defendant standing to his left, approximately six feet in front of him, facing west, holding what Yarusso believed was a cannabis cigarette. The street was well-lit, and his view of Defendant was unobstructed. Yarusso described the cigarette as hand-rolled and three to five inches long. Defendant was holding a lighter next to the side of the cigarette, in a manner Yarusso described as "roasting" the cigarette. Yarusso explained that from both training and experience he knew that persons who handroll a cannabis cigarette lick the edge of the paper to seal the cigarette, and often hold a lighter on the side of the cigarette to dry it, just before igniting it. He testified, "That's the action I recognized to be used associated with, basically, preparing a cannabis cigarette." (Tr. at 11:22-23).[3] The government introduced

---

[2] For convenience, the Court will simply reference cannabis going forward.

[3] This is a citation to the transcript of the suppression hearing, which will later be filed with the Court.

into evidence a photograph of the cigarette that was taken from Defendant, which Yarusso looked at, and agreed that it had no visible burn marks.

Believing that Defendant was acting in violation of the City Ordinance, Yarusso stopped the Mule near Defendant, got out and took the cigarette from his hands. Yarusso saw a green leafy substance poking out from its end, which he recognized as cannabis, and the cigarette smelled like cannabis. Yarusso immediately placed Defendant under arrest. During this brief encounter, Defendant started to remove a backpack from his back. Concerned for officer safety, Yarusso immediately took the backpack, and after he arrested and searched Defendant, Yarusso opened and searched the backpack. The backpack held a loaded semi-automatic pistol with an additional magazine, a laptop computer and cables, a skimming device, blank checks in different names, credit cards in different names, and a false Missouri identification document with a photograph of Defendant. Yarusso wrote a report of the incident that night.

All the officers who testified wore body cameras that evening. The MBPD standard protocol requires that officers power on the camera when they begin their shift – which places the camera in a buffering mode. To initiate recording, the officers must twice push a button on the camera, and they are instructed to do this when they interact with a citizen. Yarusso did this after he stopped and arrested Defendant; thus, there was no recording of his initial encounter with Defendant. Yarusso testified that when officers approach persons engaged in unlawful narcotics activity it can become dangerous, as they often run, and that he was justified in not turning on the camera until he felt the situation was safe.

### B. Officer Sierra

Officer Sierra ("Sierra") is a twenty-two-year veteran of the MBPD and is the neighborhood resource officer for the art deco cultural district. She too has considerable training regarding cannabis and has encountered it innumerable times over the course of her career.

On the evening of February 25, 2021, Sierra's role in the convoy of police officers was to provide security, and she carried a non-lethal pepper ball gun. She recalled that as the Mule that she was in with Yarusso got close to Defendant, she saw Defendant smoking what appeared to be a hand-rolled cannabis cigarette. Sierra testified that as she got closer to Defendant, she smelled burnt cannabis.

When Yarusso stopped the Mule right alongside Defendant, Sierra got out, walked toward Defendant, and kept her eye on all officers at the scene. She saw Yarusso grab the cigarette from Defendant, who she thought might have been stepping back and attempting to reach into the backpack; she also saw Yarusso arrest Defendant and search the backpack. As soon as Yarusso arrested Defendant, the crowd started to converge on them. Sierra's focus was to make sure that the situation did not become unsafe. She too did not have her body worn camera in a recording mode at that time and she did not write a report of these events.

### C. Officer Melendez

On the night of Defendant's arrest, Officer Melendez ("Melendez") was in another Mule in the convoy that drove slowly on Ocean Drive. He also walked over to the Defendant, but this was after Yarusso had seized the cigarette. Melendez took custody of

5

the cigarette from Yarusso once the officers were back at the police station. He did not see any visible burn marks on it and added "[a]t least the tip wasn't burnt". (Tr. at 65:22-66:4). He did not write a report.

### D. Agent Carley

Agent Carley ("Carley") has worked for the Secret Service for three years. On February 25, 2021, she was at the MBPD assisting its officers during Spring Break. Defendant was at the station, and she looked at the items found in his backpack and decided to interview him. She did so inside of a glass-enclosed room. Defendant was seated, he had a bottle of water and he was offered use of the restroom. Carley was the only one who questioned Defendant, although a second Secret Service agent was present, as was a female MBPD officer who stood by the door. None of them were armed and Defendant was not handcuffed. The two easily communicated in English. The interview was not recorded.

Carley first explained to Defendant her authority as a Secret Service Agent and that she was interested in the credit cards found in his backpack. Before she questioned him, Carley sat next to Defendant and read him his rights. She did so by using the written Secret Service Miranda Warning form. That document, which was introduced into evidence, (Gov't. Ex. 1), states very simply, line by line, each of the *Miranda* rights. Carley read to Defendant each right, one at a time, and after each right she stopped and asked Defendant if he understood what she just read, and if he had any questions. Each time Defendant said that he did understand and that he did not have any questions. Carley then asked Defendant to write his initials next to the right they had just discussed, and Defendant did this. At the bottom of the form are the questions, "Do you understand your rights?" and "Are you

willing to waive these rights and talk to us?". After each question Defendant wrote "yes" and signed the form, which Carley witnessed with her signature. Defendant also read the written *Miranda* form. The entire interview, including the *Miranda* discussion, lasted about 40 minutes.

After they spoke, Carley offered Defendant a pre-printed form, titled "Sworn Statement" on which Defendant could write a statement, if he chose to do so. He did, and he wrote a brief inculpatory statement. (Gov't Ex. 2).

### III.   Findings of Fact and Conclusions of Law

#### A.   Search and Seizure

The Fourth Amendment to the United States Constitution requires that the government have a search warrant before it can search a suspect and seize any contraband unless it can demonstrate the application of one of the recognized exceptions to that requirement. *Arizona v. Gant,* 556 U.S. 332, 338 (2009) (citing *Katz v. United States,* 389 U.S. 347, 357 (1967)). The government must establish the exception by a preponderance of the evidence. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983); *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (stating that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

Here, Yarusso's seizure of the cigarette from Defendant's hand, then arrest of Defendant and search of his person and backpack, were searches and seizures within the meaning of the Fourth Amendment. The government invokes two recognized exceptions to the Constitution's warrant requirement: 1) that the officers were justified by reasonable

suspicion to briefly stop Defendant and seize the cigarette and, thereafter, 2) the officers had probable cause to place Defendant under arrest and search him incident to that arrest. For the following reasons, I find that the government established both exceptions to the warrant requirement.

### 1. Reasonable Suspicion to Stop and Investigate

The Supreme Court, in *Terry v. Ohio,* set forth the standard of reasonable suspicion for the limited warrantless Fourth Amendment intrusion of a stop and frisk. *Terry v. Ohio,* 392 U.S. 1 (1968). Under *Terry*, law enforcement can briefly detain a person, for investigation, if they have "a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." *U.S. v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000). The reasonable suspicion must be "more than an inchoate and unparticularized suspicion or hunch." *Id.* (quoting *Terry*, 392 U.S. at 27). When analyzing whether the officers had reasonable suspicion, we look "at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Perkins,* 348 F.3d 965, 970 (11th Cir. 2003) (quotation marks and citation omitted).

Yarusso stopped Defendant on suspicion that he was violating Section 70-7 of the Miami Beach, Florida Code of Ordinances (the "Ordinance"). It states, in pertinent part:

(a) *Definitions.*

    (4) Smoking or smoke means inhaling, exhaling, burning, carrying, igniting or possessing a lighted cannabis, marijuana or hemp product.

> (b) *Prohibitions.*
>
>> (1) It shall be unlawful for any person to smoke any cannabis, marijuana or hemp product on public property.

MIAMI BEACH, FL., CODE § 70-7 (2019). The ordinance prohibits the *smoking* of cannabis on public property. Smoking is defined as a *lighted* cannabis product, that is either being inhaled, exhaled, burned, carried, ignited, or possessed. *Id.*

The reasonable suspicion analysis here first asks if Yarusso had a reasonable suspicion that the cigarette in Defendant's hand was cannabis. I find that he did. Yarusso was clear that he saw Defendant, at close range, holding a hand-rolled cigarette that he believed was a cannabis cigarette. He described how Defendant held a lighter to its side in a manner that Yarusso knew, from his specialized experience, was intended to dry a freshly hand-rolled cannabis cigarette, so that it could be smoked. Yarusso's knowledge was based upon his many prior encounters with persons using cannabis, and his training, on multiple occasions, on the appearance, smell and use of cannabis. Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citations omitted). Yarusso also knew that cannabis use was high where he was patrolling, and this too is part of the "totality of the circumstances" that this Court must evaluate, as "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow,* 528 U.S. 119, 120 (2000).

The next inquiry is whether Yarusso had a reasonable suspicion that Defendant was "smoking", or about to "smoke" – as those terms are defined in the Ordinance – the suspected cannabis cigarette. Again, I find that he did.

Notably, the government argued that Yarusso had a reasonable suspicion that Defendant was smoking the cannabis cigarette in violation of the Ordinance. Yarusso, however, testified that he did not see Defendant with the cigarette in his mouth, and he agreed that the photograph of the cigarette did not show any visible burn marks on the cigarette. Sierra, by contrast, testified that Defendant had the cigarette in his mouth, and he was smoking it; that is, Defendant "possess[ed] a lighted cannabis … product." MIAMI BEACH, FL., CODE § 70-7(a)(4). In the context of all the evidence presented to the Court, I find Sierra's testimony unreliable in this regard, and I credit Yarusso's testimony.

First, as a general proposition, I found Yarusso a credible witness; he seemed to have a pretty good memory of his encounter with Defendant, and he was generally careful in his testimony. He clearly was the officer who paid the closest attention to Defendant's actions, and he was in the best position to do so. Yarusso was the first officer to spot Defendant, he was the closest to him, and he made the decision to stop the Mule and walk up to Defendant to investigate. Yarusso was very specific, that he noticed Defendant roasting the cigarette, as a step prior to smoking it. Had Defendant been smoking the cigarette, Yarusso, as the officer closest to Defendant, was in the best position to see this. Yarusso made the decision to arrest, and he is the only officer who wrote a report of the incident and did so that same night. The process of writing a report, even if it did not include

the specifics of Defendant's actions with the suspected cannabis cigarette, no doubt helped reinforce Yarusso's memory of the incident.[4]

Sierra, by contrast, had a different job, to look out for the safety of the multiple officers who were in the chaotic situation of being surrounded by crowds of Spring Break celebrants, late at night, in an atmosphere where acts of violence and drug use were commonplace. Plainly, safety was the focus of her attention. She may have conflated in her memory other instances during that time when officers encountered persons smoking lighted cannabis products. Given the complete contradiction between Sierra's testimony on this point, and that of Yarusso, for all these reasons, I credit Yarusso's testimony.

That being so, I conclude that the record does not support a finding that Defendant's cigarette was a "lighted cannabis…product", as was necessary to violate the Ordinance. Yarusso was clear that the purpose of roasting a cannabis cigarette is to *dry* it in *preparation* for smoking. Government counsel suggested that Defendant's use of a lighter to dry the cigarette satisfies the Ordinance's requirement that the cigarette be a "lighted cannabis … product." Given that the prohibition is *smoking* cannabis on public property, this makes no sense. To actually smoke a cigarette, the contents must be lit, and Defendant had not yet lit the tip of his cigarette at the time Yarusso took the cigarette from him.

The record does, however, provide objective and particular evidence to suspect that Defendant was *about to commit* a violation of that Ordinance; that is, that he was preparing to "smoke" a cannabis cigarette on public property. Yarusso testified that Defendant was

---

[4] Neither party introduced the report into evidence.

"roasting" the cigarette while standing on Ocean Drive, and Yarusso knows, from his training and experience, that roasting takes place "right before they ignite it." (Tr. at 11:20-21). In other words, Defendant was about to possess a "lighted cannabis…product" in violation of the Ordinance.

As noted above, the Supreme Court, in *Terry v. Ohio*, authorized law enforcement to briefly detain a person for investigation, if they have "a reasonable, articulable suspicion based on objective facts that the person has engaged in, *or is about to engage in, criminal activity*." *Powell*, 222 F.3d at 917 (emphasis added). Yarusso had a "particularized and objective basis for suspecting"[5] Defendant was about to violate Ordinance 70-7, and therefore he was justified in stopping Defendant and seizing the cigarette he was holding.

In sum, the initial Fourth Amendment intrusion, that is, Yarusso's seizure of Defendant's cigarette, was supported by the reasonable suspicion exception to the Fourth Amendment warrant requirement. The government established this by a preponderance of the evidence.

### 2.   **Probable Cause to Arrest**

The probable cause standard is similar to, but requires more than, that expected of a *Terry* stop. "For probable cause to exist, an arrest must be objectively reasonable based on the totality of the circumstances. This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect

---

[5] *Perkins,* 348 F.3d at 970.

has committed, is committing, *or is about to commit an offense.*" *United States v. Dunn*, 345 F.3d 1285, 1290 (11th Cir. 2003) (first quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002; then quoting *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (emphasis added). Notably, the offense may be a misdemeanor violation of the law.[6]

Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quotation marks and citation omitted). For this reason, "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime…." *United States v. Lyons*, 403 F.3d 1248, 1254 (11th Cir. 2005) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)).

The evidence is clear that Yarusso decided to arrest Defendant immediately after he closely inspected the cigarette and, at that point, Yarusso had probable cause to arrest him. Yarusso testified that when he took the cigarette from Defendant's hand, he smelled it and "[t]he odor smelled like cannabis and/or hemp." (Tr. at 15:13-17). The smell of marijuana can create probable cause. *See e.g., United States v. Ward*, 722 Fed. Appx. 953, 963 (11th Cir. 2018) (holding that "the officers had probable cause to search the vehicle based on the smell of marijuana alone"); *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) ("There is no doubt that the agent's suspicions rose to the level of probable cause

---

[6] *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."); *United States v. Williams*, 731 Fed. App'x 863, 867 (11th Cir. 2018) ("In a long line of cases, we have held that the smell of marijuana coming from a person's house or vehicle establishes probable cause for a search.") (citations omitted).

Yarusso also testified that when he inspected the cigarette, he "could see a green leave like substance poking out of the end of the cigarette which [he] recognized to be cannabis and/or hemp." (Tr. at 14:21-15:2). This too supports probable cause. *See e.g., Rener v. Beto*, 447 F.2d 20, 21 (5th Cir. 1971) (officers' conclusion that small, thin cigarette was a marijuana cigarette given its appearance, based on their prior experience, supported probable cause to arrest defendant for possession of a narcotic drug);[7] *United States v. Woods*, 216 Fed. App'x 931, 934 (11th Cir. 2007) (officers had probable cause to search car where they "observed rolling papers in the driver's side door that are commonly used to make marijuana cigarettes" and smelled faint odor of burnt marijuana). Moreover, the reasons recounted above – Yarusso's his training and experience, observations of Defendant, and the prevalence of unlawful cannabis use by Spring Break celebrants – further bolstered probable cause. *See e.g., United States v. Tate*, 855 Fed. App'x 509, 212 (11th Cir. 2021) (officers had probable cause to arrest defendant for possession of marijuana where they "did not know for certain that the cigarillo contained marijuana, but

---

[7] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

they had a reasonable basis to believe that it did" because officers had between three and five years' experience with police department, encountered "blunts" daily or monthly, and never encountered blunts or cigarillos that did not contain marijuana).

For these reasons, Officer Yarusso had probable cause that Defendant was about to smoke a cannabis cigarette in violation of Ordinance 70-7 and, thus, Defendant's warrantless arrest did not violate the Fourth Amendment.

### 3. Search of the Backpack Incident to Arrest

Next, the government has shown, again by a preponderance of the evidence, that Yarusso's warrantless seizure and search of Defendant's backpack, was constitutional. "The ultimate touchstone of the Fourth Amendment is reasonableness." *Riley v. California*, 573 U.S. 373, 381 (2014) (citation and quotation marks omitted). The Supreme Court, in a series of decisions that began with dictum in *Weeks v. United States,* 232 U.S. 383 (1914), has recognized that a warrantless search incident to a lawful arrest satisfies the reasonableness requirement of the Fourth Amendment, and it thus is an exception to the warrant requirement.

Specifically, in *Chimel v. California*, 395 U.S. 752, 763 (1969), the Supreme Court established that incident to arrest, officers may search where an arrestee might reach, and seize any weapons or evidence. Later, in *United States v. Robinson*, 414 U.S. 218 (1973), the Court made clear that this search may be made whether or not there is probable cause to believe that the person arrested has a weapon or is about to destroy evidence. This is because the "potential dangers lurking in all custodial arrests make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer

15

to calculate the probability that weapons or destructible evidence may be involved." *United States v. Chadwick*, 433 U.S. 1, 14-15 (1977) (quoting *Robinson*, 414 U.S. 218).

Yarusso lawfully arrested Defendant and his warrantless search of Defendant's person and his backpack was permitted by the search incident to arrest doctrine.

### B. Defendant's Post-*Miranda* Statements

Defendant challenges the admissibility of his post-*Miranda* statements. Relying on the "fruit if the poisonous tree doctrine", he first argues that his statements must be excluded from evidence as the product of the alleged unconstitutional search and seizure of his person and backpack. (ECF No. 16 at 5). Having found that the search and seizure of his person and backpack was lawful, that argument has no merit.

Second, Defendant argues that his post-*Miranda* statements must be excluded from evidence as violation of his Fifth Amendment rights. (*Id.* at 6). This too lacks merit.

Before a suspect can be subjected to custodial interrogation, he must be advised "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). "[F]ailure to give the prescribed [*Miranda*] warnings and obtain a valid waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).

Carley credibly testified that she advised Defendant of his *Miranda* rights in a textbook-like fashion; that is, she told Defendant about each right one-at-a-time, stopping

after each right to confirm that he understood it and did not have any questions. And, she had Defendant confirm this with his initials by each right.

Carley also credibly testified that Defendant properly waived those rights and agreed to speak with her and make a written statement. A defendant may waive his *Miranda* rights "provided that the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444.

The existence of a valid waiver has two components. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A court can conclude that *Miranda* rights have been waived "[o]nly if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension[.]" *Id*. at 421.

The government has established both components by a preponderance of the evidence, as it must. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). First, it has shown that Defendant's waiver was the product of a free and deliberate choice. The interview did not last long (approximately 40 minutes), Defendant was not handcuffed, he was given water and was told that he could use the restroom, and neither Carley nor the other officers in the room had weapons. There is simply no evidence, or inference that might be drawn from the evidence, that law enforcement officers intimidated, coerced, or deceived him into waiving his *Miranda* rights. *See, e.g., United States v. Sharma,* No.

17

6:09–CR–1–ORL–19GRJ, 2009 WL 152868, at *8–10 (M.D. Fla. Jan. 21, 2009) (court denied motion to suppress statements because there was "no evidence" that the defendants were "deprived of food, sleep or any necessities over the course of any of the interviews" or that the defendants were "yelled at" or "threatened ... with physical harm."); *United States v. Anderson,* No. 07–14030–CR, 2007 WL 1970856, at *13 (S.D. Fla. July 3, 2007) (denying motion to suppress because defendant failed to present any evidence that his confession was a product of coercion (i.e. deprivation of food, drink, or sleep) and thus involuntary).

Second, without any contradiction, the evidence indicates that Defendant understood his rights and the consequences of his waiving them. Carley deliberately explained each right and confirmed that Defendant understood it. Defendant heard these rights from Carley and read them on the clearly stated form. Carley told him that she was a law enforcement officer with the Secret Service, that she was interested in the credit cards found in his backpack and asked if he would give up his rights and speak with her. The government has satisfied its burden of proof and demonstrated that Defendant's statements were not procured in violation of his Fifth Amendment rights.

### IV.  Conclusion

For the foregoing reasons, I **RESPECTFULLY RECOMMEND** that the Court **DENY** Defendant's Motion to Suppress Physical Evidence and Statements, (ECF No. 16).

### V.  Objections

**No later than fourteen days from the date of this Report and Recommendation** the parties may file any written objections to this Report and Recommendation with the

Honorable Donald L. Graham, who is obligated to make a *de novo* review of only those factual findings and legal conclusions that are the subject of objections. Only those objected-to factual findings and legal conclusions may be reviewed on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985), 28 U.S.C. § 636(b)(1); Fed.R.Crim.P. 59(b), 11th Cir. R. 3-1 (2016). If the government wishes to file a response to any objections, it must do so by **February 2, 2022**.

DONE AND RECOMMENDED in Miami, Florida this 12th day of January 2022.

CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE


Cc: The Honorable Donald L. Graham
    Counsel of record